IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARY L. DAVIS, n/k/a MARY LUE ALLEN, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:09-cv-95 GPM-DGW |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATIONS

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge G. Patrick Murphy pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the Petition for Review of the Commissioner's Decision Denying Benefits filed on February 4, 2009, by Mary Lue Allen ("Claimant") (Doc. 2). For the reasons below, it is **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be entered in favor of the Commissioner, and that the Court adopt the following findings of fact and conclusions of law:

## FINDINGS OF FACT

Claimant applied for disability, disability insurance benefits, and supplemental security income on March 31, 2006 (Tr. 119-126). Claimant's application was denied initially on August 2, 2006 (Tr. 74-78), and upon reconsideration on October 16, 2006 (Tr. 81-87). Claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on December 12, 2006 (Tr. 94). ALJ Joseph W. Warzycki held a hearing on March 12, 2008 (Tr. 25-69). By decision dated May 28, 2008, the ALJ found Claimant was not entitled to disability insurance or

supplemental security benefits (Tr. 11-21).  Plaintiff requested and the Appeals Council denied review (Tr. 1-7). Thus the ALJ's decision became final. 20 C.F.R. § 416.1481.  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).  Claimant now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g).

### *Claimant's Application for Benefits*

Claimant was born on October 15, 1961 (Tr. 119).  She was 42 years old at the alleged onset-of- disability date of January 1, 2004.  Claimant graduated from high school and completed one year of college (Tr. 162).  Claimant alleges the following disabling conditions: diabetes, neuropathy, arthritis, hypertension, Grave's disease, 40% loss of use of the right arm, hiatal hernia, acid reflux, bulging discs, bursitis, and carpal tunnel syndrome (Tr. 155).  As a result, she cannot lift much weight, she cannot grip with her right hand, her mobility is limited, and she experiences "excruciating" pain (Tr. 156).

At the time of the alleged onset of disability, Claimant was working part-time as a ward clerk at St. Elizabeth's Hospital.  She stopped working due to pain and loss of function of her arm (Tr. 145). In that job, Claimant entered physicians' orders into a computer and filed orders in binders. She was required to walk for one hour; to sit for five hours; stoop for one hour; handle, grab, or grasp objects for three hours; reach for five hours; and write, type, or handle small objects for five hours in an eight-hour workday (Tr. 157). The job required frequent lifting of medical files weighing two to four pounds and occasional lifting of up to ten pounds (Tr. 157).

### *Claimant's Medical History*

Dr. Harvey L. Mirly performed carpal tunnel release surgery on Claimant's right arm in February 2002 and on her left arm in March 2002.  On June 21, 2002, Dr. Mirly reported that claimant was "doing well."  He recommended she return on an as needed basis (Tr. 206-210).

2

On January 14, 2003, Claimant saw Dr. Thomas F. Tse.  He assessed her diabetes, and directed her to continue taking Glucophage.  He reported hypertension and obesity.  Dr. Tse reported claimant's medications as Prevacid,[1] Synthroid,[2] Clarinex,[3] Glucophage, and Diovan[4] (Tr. 559).  On April 23, 2003, Dr. Tse increased the dosage of Claimant's prescription of Diovan (Tr. 560).

On April 29, 2003, Claimant saw Dr. Anwar Khan for pain in her low back and right hip after a fall.   Upon examination, he diagnosed bilateral sacroiliac strain and possible right throchanteric bursitis.  He ordered x-rays of her right hip, which revealed no fracture or dislocation and started her on physical and occupational therapy programs (Tr. 364, 371, 577-78).  An MRI of Claimant's hip on April 30, 2003, revealed a "slight thinning of the articular surface cartilage posterosuperior consistent with some early changes of osteoarthritis" (Tr. 408).

Dr. Tse ordered an upper endoscopy on May 21, 2003, for Claimant's epigastric pain.  The test, performed by Dr. Vasantha Pai, revealed a large hiatal hernia and erosive gastritis.  Dr. Pai performed a biopsy, which was negative for H. Pylori bacteria.  Dr. Pai prescribed Nexium[5] (Tr. 412-13).

Claimant saw Dr. Gregory J. Simmons, an orthopedic surgeon, on August 8, 2003, for pain

---

[1]Prevacid is indicated for the short-term treatment of gastric ulcers.  *Physicians' Desk Reference* 3268 (60th ed. 2006).

[2]Synthroid (levothyroxine) is indicated for the treatment of hypothyroidism. *Physicians' Desk Reference* 515 (60th ed. 2006).

[3]Clarinex (desloratadine) is indicated for the treatment of seasonal allergies. *Physicians' Desk Reference* 3009 (60th ed. 2006).

[4]Diovan (valsartan) is indicated for the treatment of hypertension. *Physicians' Desk Reference* 2191 (60th ed. 2006).

[5]Nexium is indicated for the short-term treatment of erosive esophagitis. *Physicians' Desk Reference* 645 (60th ed. 2006).

in her right elbow.  He reported that therapy and intermittent anti-inflammatory medications had not relieved her pain.  He noted pinpoint tenderness over the anterolateral aspect of the elbow, pain with resisted wrist extension, and mild pain with both full elbow extension and wrist flexion.  Dr. Simmons injected her elbow with lidocaine (Tr. 336).

Dr. Brett R. Grebing, an orthopedic surgeon and partner of Dr. Simmons, examined Claimant on October 21, 2003.  She complained of right elbow pain at a level of five on a scale from zero (no pain) to ten (most severe pain).  He noted increased swelling and pain along the extensor musculature as well as the insertion at the lateral epicondyle.  He reported Claimant had difficulty at work with lifting and using a computer mouse.  Claimant reported some relief with the August lidocaine injection, but increased pain thereafter.  He reported tenderness along the lateral epicondyle and with wrist extension and wrist flexion.  He also reported tenderness along the cubital tunnel.  He performed a second lidocaine injection and recommended that claimant continue to take Vioxx (Tr. 337).

Dr. Grebing saw Claimant again on November 25, 2003, for follow up.  She reported relief for several weeks from the previous lidocaine injection, but was then "experiencing increasing problems similar to before."  She also reported pain in her right shoulder and back.  He diagnosed right lateral epicondylitis (tennis elbow).  On December 15, 2003, Dr. Grebing prescribed Flexeril[6] (Tr. 338).

On January 8, 2004, Claimant saw Dr. Grebing complaining of continued elbow pain which radiated into her shoulder and back.  She reported a knot in her back.  Dr. Grebing noted tenderness at the insertion of the extensor musculature, the lateral epicondyle and the medial epicondyle.  He

_____

[6]Flexeril (cyclobenzaprine) is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. *Physicians' Desk Reference* 1833 (60th ed. 2006).

also noted a palpable mass in the suprascapular musculature inferior to the trapezius.  He reported Claimant was receiving a second opinion regarding her elbow.  Dr. Grebing performed a lidocaine injection to the trigger point in her back (Tr. 338).

On January 15, 2004, Dr. Michael P. Nogalski, M.D. performed an independent medical evaluation of Claimant.  Examination revealed Claimant to be moderately obese and in no apparent distress with normal mood and affect.  He noted point tenderness over the lateral epicondyle and tenderness with resisted wrist, finger, and thumb extension.  Normal grip strength, but tenderness with grip strength.  She exhibited full range of motion in the elbow with intact stability.  Examination of the right shoulder showed some "mild tenderness at the extremes of forward flexion and abduction with external rotation to 70 degrees.  Full range of motion in neck.  X-rays of right elbow are negative."  Dr. Nogalski diagnosed persistent lateral epicondylitis.  He opined that it could be work-related.  He advised postponing more aggressive treatment in favor of activity modification, relative rest, and another cortisone injection.  He also recommended evaluation of her thyroid status.  A February 16, 2004, note indicates that Dr. Nogalski believed Claimant would be capable of light duty work with no repetitive lifting of more than one pound (Tr. 269-71).

Dr. Grebing saw Claimant again on January 29, 2004.  He followed Dr. Nogalski's recommendations for physical therapy and requested that Dr. Tse, Claimant's primary care physician, do a thyroid check.  Dr. Grebing did not agree to give an additional cortisone injection as recommended by Dr. Nogalski, however, because the last two cortisone injections had caused "severe alteration of her blood glucose."  As a result, he was unwilling to provide an additional cortisone injection (Tr. 339).  Dr. Grebing ordered that Claimant not work for two weeks beginning February 18, 2004 (Tr. 330).

Dr. Grebing saw Claimant again on February 27, 2004, for follow-up.  She reported that the

physical therapy had led to "almost no improvement in her right elbow pain." She also complained of medial elbow pain, and pain in the neck, back, and shoulder. Dr. Grebing reported that "[s]he has failed an exhaustive conservative course and desires further interventional treatment at this time" (Tr. 340).

On March 9, 2004, Claimant saw Dr. Tse. He reported that surgery on her right elbow had been delayed due to her hyperglycemia. He reported her medications as Glucotrol, Glucophage, Diovan, Aciphex,[7] Synthroid, Allegra,[8] Lexapro,[9] and Robaxin (Tr. 561). He reported her blood glucose was 210. He reported that she was scheduled for surgery, but she "must get glucose under control" (Tr. 561). On March 11, 2004, Claimant received instructions on insulin administration. She was prescribed Lantus[10] and Novolog[11] (Tr. 556). On March 16, 2004, her blood glucose was still elevated. Dr. Tse increased the dosage of Lantus. He cleared her for surgery (Tr. 562).

Dr. Grebing performed surgical release of right lateral epicondyle on March 17, 2004 (Tr. 323-24). On March 30, 2004, Claimant complained of pain which Dr. Grebing described as "consistent with surgery." He authorized a return to work but restricted the use of her right hand. He anticipated she would be able to work "light duty" with her right arm in two weeks and would require approximately twelve weeks of total post-surgical treatment (Tr. 342).

---

[7]Aciphex (rabeprazol sodium) is indicated for the treatment of gastric ulcers. *Physicians' Desk Reference* 1081 (60th ed. 2006).

[8]Allegra (fexofenadine hydrochloride) is indicated for the treatment of seasonal allergic rhinitis. *Physicians' Desk Reference* 2857 (60th ed. 2006).

[9]Lexapro is indicated for the treatment of major depressive disorder. *Physicians' Desk Reference* 1193 (60th ed. 2006).

[10]Lantus is indicated for the treatment of diabetes. *Physicians' Desk Reference* 2925 (60th ed. 2006).

[11]Novolog is indicated for the treatment of diabetes. 2009 PDR 5755-0200.

6

On April 13, 2004, Claimant continued to complain of swelling and pain.  Dr. Grebing did not believe she would be able to return to work at that time.  He referred her to physical therapy for additional range of motion exercises, edema control, and desensitization, but not strengthening (Tr. 342).  On April 27, 2004, Claimant reported no new complaints, although she continued to complain of mild tenderness in her elbow.  Dr. Grebing released her for light work for eight hours at a time for two days a week, with limitations that she not push, pull, or lift anything greater than 15 pounds.  He added strengthening to her physical therapy (Tr. 343).  On June 2, 2004, Claimant reported improved pain but occasional swelling in the elbow.  Dr. Grebing continued her light-duty work restrictions (Tr. 343).

Claimant saw Dr. Tse on July 29, 2004.  Her blood glucose was 120.  She reported that she had been following the South Beach diet.  Her hypertension was reported as stable (Tr. 555).  Her medications were Lexapro, Diovan, Lantus  Aciphex, Synthroid, and Humalog (Tr. 562).

Dr. Grebing reevaluated Claimant on September 9, 2004, for her complaints of pain over the medial aspect of her right elbow, which began a month or two after her surgery.  Upon examination he noted mild swelling in the elbow, with tenderness along the extensor musculature.  He reported tenderness with palpation over the cubital tunnel with positive elbow flexion test with numbness and tingling into the ring and small fingers.  He diagnosed right elbow cubital tunnel syndrome.  He indicated that Claimant had achieved the maximum medical improvement from the lateral side of the elbow, but still had problems with the medial side.  He recommended EMG and nerve conduction studies to evaluate her nerve function.  He continued her work restrictions (Tr. 317-318).

Dr. Anwar Khan, M.D. performed nerve conduction studies on September 20, 2004.  The studies were normal except for "mild prolongation of bilateral median nerve sensory distal latencies at wrist and bilateral median nerve conduction velocities across the wrist is slow" (Tr. 333-35).

7

On September 23, 2004, Claimant complained of continued pain in the inner aspect of the right elbow.  Dr. Grebing reported the essentially normal EMG and nerve conduction studies. He diagnosed right elbow medial epicondylitis, performed an injection of lidocaine, and ordered additional physical therapy (Tr. 345).  On November 22, 2004, Dr. Grebing prescribed Vicodin;[12] on December 7, 2004, he prescribed Flexeril (Tr. 345-46).

On October 27, 2004, Dr. David M. Brown, M.D., of the Orthopedic Center of St. Louis performed an independent medical evaluation of Claimant.  He found Claimant to be moderately overweight.  He found good active range of motion of the elbow with "some mild patchy tenderness over the right elbow that does not correspond to a specific anatomical structure."  He reported no increased pain with resisted pronation or resisted wrist extension.  X-rays showed no bone or joint abnormality.  He diagnosed "nonspecific right upper extremity pain." He reported that Claimant had multiple subjective complaints of pain in her right arm.  He opined that "she may have a component of mild underlying epicondylitis but her symptoms are diffuse and her findings on examination are nonspecific."  He noted her residual pain from the right lateral elbow surgery but noted her examination was "negative for a significant ongoing peripheral compression neuropathy."  Dr. Brown advised against surgery for her medial elbow pain and recommended nonsteroidal anti-inflammatory medication as needed.

Dr. Brown opined that her work as a ward clerk would not "be considered a significant factor in the development of either lateral or medial epicondylitis or a significant peripheral compression neuropathy."  He noted that she works only part time and that her job activities are not "significantly hand intensive and they are done for short periods of time."  He reported: "[a]t this point I see no

---

[12]Vicodin (hydrocodone) is indicated for the treatment of moderate to moderately severe pain. *Physicians' Desk Reference* 530 (60th ed. 2006).

objective reason why she cannot work without restrictions" (Tr. 267-68).

On December 3, 2004, Dr. Simmons saw Claimant for pain in her left hip.  He performed a lidocaine injection (Tr. 346).  On February 8, 2005, Claimant saw Dr. Grebing and complained of continued pain in the medial aspect of her right elbow.  He diagnosed right elbow medial epicondylitis, post-surgical lateral epicondylitis, and a trigger point in her right back.  He prescribed additional physical therapy and released her from work for three weeks during the therapy (Tr. 346).  On February 18, 2005, Dr. Grebing would not refill Vicodin, but instead gave her a prescription for Skelaxin[13] (Tr. 346).

A December 5, 2004, x-ray of Claimant's foot revealed degenerative osteoarthritic changes, a small heel spur, but no fracture (Tr. 453).

On December 24, 2004, Claimant saw Dr. Tse for an upper respiratory tract infection.  Dr. Tse noted Claimant's history of attempted suicide.  Her fasting glucose was 205.  He prescribed Advair and Ketek for the upper respiratory tract infection and ordered bloodwork and a chest x-ray (Tr. 563).

On January 16, 2005, Claimant fell on a patch of ice, injuring her left knee and right arm.  X-rays of her right wrist, right hand, and left knee were normal, showing no fractures or dislocations.  The treating emergency room physician, Dr. Al-Kadiri, diagnosed right hand and wrist sprain, and left knee contusion.  He prescribed Motrin and advised use of ice packs (Tr. 212-230).

On January 25, 2005, Claimant saw Dr. Tse for dyspnea.[14]  He ordered chest x-rays and a CT scan.  He reported her blood glucose at 345.  Her medications were listed as Lexapro, Diovan,

---

[13]Skelaxin (Metaxalone) is indicated for treatment of acute, painful musculoskeletal conditions. *Physicians' Desk Reference* 1685 (60th ed. 2006).

[14]Dyspnea is shortness of breath. *Stedman's Medical Dictionary* 601 (28th ed. 2006).

Lantus, Prevacid, Synthroid, and Humalog (Tr. 565). The chest x-ray revealed "resolved right basilar subsegmental atelectasis at the right lung base" normal heart size, normal peripheral pulmonary vessels, no pleural effusion, evidence of an old sternal injury, and minimal thoracic spondylitic changes (Tr. 486). A January 26, 2005, CT scan of the chest revealed "minimal linear atelectasis to the right middle lobe and lingular segement of the left upper lobe." The lungs were otherwise clear. There was no evidence of pleural effusion (Tr. 491-92).

Claimant saw Dr. Tse on March 18, 2005. She complained of edema to the lower extremities and left side chest pain radiating to her back. He gave her samples of Prevacid and ordered her to discontinue the use of Aciphex (Tr. 553).

On April 18, 2005, Claimant saw Dr. Tse for a stress test. Claimant complained of chest pain and shortness of breath. Dr. Tse noted the results of January 2005 x-rays and informed Claimant that her shortness of breath was likely due to obesity. He noted her blood glucose was 350. He referred her to a dietician for an 1800 calorie diabetic, low-salt, low cholesterol diet. He reported her history of hyperglycemia due to noncompliance with diet. He reported slightly elevated blood pressure and recommended that she continue with her current medications, which he listed as Lexapro, Diovan, Lantus, Prevacid, Synthroid, and Humalog (Tr. 552).

On May 3, 2005, Dr. Grebing prescribed physical and occupational therapy two to three times per week, up to twelve visits, for Claimant's right elbow and right shoulder pain.

On July 12, 2005, Bill Merink, an occupational therapist, performed a Functional Capacity Evaluation of Claimant at the request of Dr. Grebing. He determined that Claimant could perform light work including exerting up to twenty pounds of force occasionally and ten pounds frequently. Mr. Merink determined that Claimant's past work as a ward clerk is classified as medium work because it required the ability to push up to 25 pounds. He determined, therefore, that Claimant

could not perform her past work as a ward clerk at that time.  Based on objective testing, Mr. Merink determined that claimant could push nine pounds of force one handed with right forearm weakness.  Her pain level during testing remained at three on a scale from zero to ten.  She had poor bilateral hand dexterity.  Her body mass index indicated she was obese and approximately 145 pounds overweight.  Mr. Merink reported that Claimant used consistent and full physical effort during the testing, and tests showed no symptom magnification regarding her reports of pain.  He recommended that Claimant "did not demonstrate the requirements necessary to return back to work on a full time basis" (Tr. 264-65).

Claimant saw Dr. Khan on February 6, 2006, complaining of low back and left hip pain.  He noted impaired pin prick sensation in her entire left leg.  He opined that the pain is "probably secondary to left sacroiliac strain and left throchanteric bursitis."  He ordered physical therapy, an MRI of the lumbar spine, and electrodiagnostic studies (Tr. 461-78).  A February 9, 2006, MRI revealed mild facet arthropathy at L5-SI, but was otherwise normal.  There was "no neural foraminal narrowing or high grade spinal stenosis at any level" (Tr. 574).  February 15, 2006, electrodiagnostic testing indicated bilateral L5 radiculopathy (Tr. 572).  On February 27, 2006, Dr. Khan examined Claimant and noted continued back pain.  He ordered that she continue physical therapy (Tr. 571).  Claimant was discharged from physical therapy on March 14, 2006, for noncompliance with the treatment program and failure to attend the reevaluation appointment (Tr. 464).

Claimant saw Dr. Tse on April 4, 2006.  Her blood sugar was 286.  He reported that she had not been compliant with her medications (Tr. 367).  She saw Dr. Tse again on April 10, 2006.  He reported her blood sugar was 319, "due to dietary indiscretion."  He prescribed continued use of Lantus and Novolog.  He directed Claimant to see a dietician.  He reported peripheral neuropathy related to her diabetes.  He noted that her blood pressure was slightly elevated and recommended

11

continued use of her hypertension medication (Tr. 479-82, 550).

On July 13, 2006, Dr. Mirly wrote a letter summarizing Claimant's past carpal tunnel surgeries and a recent examination. He recorded her complaints of numbness in the ring and small fingers bilaterally. Palpation at the retrocondylar groove reproduced the symptoms of paresthesias to the ring and small fingers. She had diminished grip strength and pain and swelling in the right hand. He reported her carpal tunnel incisions well-healed, with no complaints. He diagnosed "status post bilateral carpal tunnel releases doing well, status post right lateral epicondylar release with pain, ongoing left lateral epicondylitis or tennis elbow and probable bilateral medial cubital tunnel syndrome" (Tr. 580).

On July 31, 2006, Dr. Henry S. Bernet examined Claimant's medical records for the state Disability Determination Services ("DDS"). He determined that Claimant retained the following Residual Functional Capacity ("RFC"): she could occasionally lift twenty pounds, frequently lift 10 pounds, stand six hours in an eight-hour workday, sit six hours in an eight-hour workday. He reported an unlimited ability to push or pull. He found no postural, manipulative, visual, communicative, or environmental limitations (Tr. 581-88). He reported a primary diagnosis of degenerative disc disease, secondary diagnoses of diabetic neuropathy and carpal tunnel syndrome (Tr. 581).

Claimant saw Dr. David LeBeau on September 21, 2007. She indicated she was applying for disability. She complained of a vaginal infection. Dr. LeBeau noted sleep apnea and ordered a sleep study. He also noted that Claimant had not taken insulin for several months because "she was tired of using it." He prescribed Cymbalta for depression, Diflucan, and Actos for her diabetes (Tr. 597-98). Claimant saw Dr. LeBeau on October 15, 2007, for a spider bite on her calf with swelling and pain. (Tr. 595). Claimant saw Dr. LeBeau on November 6, 2007, and complained of

12

irregular periods and menstrual cramping.  Dr. LeBeau ordered bloodwork (Tr. 593).  Claimant called Dr. LeBeau's office on January 3, 2008, complaining of restless legs at night preventing sleeping and cold and numb toes.  Dr. LeBeau responded that Claimant should take over-the-counter, nonsteroidal anti-inflammatory medications at bedtime (Tr. 592).

Claimant saw Dr. LeBeau on January 30, 2008, complaining of lower back pain, numbness in her toes, and pain in her arms that radiated to her shoulders.  Dr. LeBeau noted that Claimant had an MRI of her spine, nerve conduction studies on her upper extremities, and a functional capacity evaluation in the last two years.  He increased her dosage of Cymbalta and prescribed Ultram (Tr. 591).

Dr. LeBeau performed a Functional Capacity Assessment on March 18, 2008.  He determined that Claimant could lift a maximum of fifteen pounds occasionally, could stand or walk only five minutes in an eight-hour workday, could sit for only twenty minutes before needing to shift her weight, and could not get through an entire eight-hour workday without lying down (Tr. 611-13).

Maria Ross, a physical therapist, performed a Functional Capacity Evaluation ("FCE") on April 9, 2008, at the request of Dr. LeBeau.  She determined that Claimant had consistent complaints of pain throughout the testing process.  She was not able to tolerate multiple repetitions of activities and was unable to tolerate prolonged sitting or standing.  She determined that it was unlikely that Claimant would be able to return to work due to her chronic pain.  Ms. Ross recommended disability (Tr. 615).  In the Functional Capacity Evaluation section, Ms. Ross reported that Claimant demonstrated the ability to occasionally lift twenty pounds at the knee, twenty-five pounds at the waist, and five pounds at the shoulder.  Ms. Ross also reported the Claimant could sit frequently, stand and walk occasionally, never kneel, and occasionally key with her left hand (Tr. 619).

*The ALJ Hearing*

Claimant appeared before the ALJ on March 12, 2008.  She was represented by counsel. Also present were Jeff Allen, Claimant's husband, as an observer, and Vincent Stock, a vocational expert (Tr. 27-28).

Claimant testified that she was 46 years old, five feet five inches tall, and weighed 301 pounds (Tr. 31).  She testified that she became unable to work on January 1, 2004, due to pain in her right elbow.  At the time of the hearing, she experienced pain in both elbows.  She explained that a pinched nerve in the elbow causes numbness in her fingers and shooting pain across her back (Tr. 36-37).  She testified that she has multiple knots across her shoulder blades (Tr. 37).

She testified that she is a certified ward clerk or unit secretary, meaning she is authorized to work as a unit secretary in a hospital (Tr. 36).  Claimant indicated that after her elbow surgery she did not work, but she applied for other clerical jobs (Tr. 37).  Claimant testified that over the past twenty years she had performed clerical work in various jobs.  She last worked as a ward clerk at St. Elizabeth's hospital (Tr.39).  In that position she performed computer data entry and filing.  She was also required to be "up and down" getting charts from across the room.  She testified that because of the pain in her elbows she had great difficulty lifting doors to the dumb waiter, where she would receive charts (Tr. 39-40).  She testified that between 1996 and 2003 she owned a strip club.  She performed accounting and bartending (Tr. 40-41). She testified that she received workers' compensation in 2003 after surgery on her elbow (Tr. 34).

Claimant testified that she wakes at 6:30 each morning in order to help her daughter get ready for school.  She goes to sleep at 9:00 p.m.  She does not sleep well (Tr. 42).  She drives her daughter to school each day.  When she returns, she naps for a short time.  She testified that for the rest of the day she has very little energy.  She cooks, but her daughters do most of the housework,

including washing dishes, making beds, and vacuuming (Tr. 43-44).  She testified that most days she watches Jerry Springer or rides in the car with her husband if he "has someplace to go," but otherwise she does not go out much (Tr. 44).  She testified that she occasionally visits with her friends or her husband's friends (Tr. 44-45).  She testified that she is a member of the Ladies Auxiliary for the VFW and acts as their secretary.  In this capacity she attends meetings monthly and participates in other functions.  She takes minutes of the meetings and then types them on the computer (Tr. 46).  She testified, however, that she is able to type for only five or ten minutes at a time before her hands and arms hurt (Tr. 64).  She cannot easily use a cell phone because her hands cramp after only five minutes (Tr. 64).  She frequently watches television (Tr. 46).  In the summer she might try to mow the grass but it causes her shortness of breath.  She plants a few flowers.  She testified she has no hobbies (Tr. 47-48).

Claimant testified that she takes Cymbalta for depression and pain, but it is not effective.  She testified that she takes Actos, an oral medication, for diabetes.  She testified that she has refused insulin treatment because she hates needles (Tr. 49).  She testified she hates checking her blood sugar and that her blood sugar is probably not under control (Tr. 49-50).  She testified she takes Levothyroxine for her thyroid, and Diovan for her blood pressure, which is "sky high."  She takes Pepcid for acid reflux and hiatal hernia (Tr. 50).  She takes Tylenol and Aleve for pain control, and occasionally takes one of her husband's Vicodin (Tr. 51).  She testified that her pain is at a six or seven on a scale from one to ten when she takes the medication (Tr. 51).  She testified that she has no major side effects from her medications (Tr. 55).

She testified that she experiences back pain that causes difficulty sleeping.  She testified that she has a bulging disc at L 4-5 and the beginning of arthritis (Tr. 52).  She testified that she injured her elbow from pulling charts out of the rack at her job as a ward clerk.  She had surgery to correct

the problem in 2004, but she testified that the elbow still hurts all the time (Tr. 52).  She testified that she doesn't have the strength in her elbow that she once did and her hands "go numb" (Tr. 52).  She testified she can reach and hold her hands over her head, can button buttons, and zip a zipper, but she frequently drops knives, forks, and spoons.  She has some difficulty fixing her hair and bending over to put on her socks and shoes (Tr. 53-54).

She testified that she does not like to go shopping because she experiences hot flashes and panic attacks and has to leave the store (Tr. 44).  She testified that she has difficulty walking in a store and must hold on to a grocery cart for support.  She testified that her back hurts all the time and she has restless legs syndrome.  She testified she can stand for only five minutes before her back and legs begin to hurt and she has to sit down (Tr. 58).  She testified she becomes short of breath from climbing a staircase (Tr. 59).  She testified she can lift only ten pounds.  She testified she has difficulty bending, stooping, and crouching (Tr. 59).

She testified that she suffers from depression.  She testified that she has crying spells a few times a week, is "crabby," does not want "to do anything," wants to be "left alone," and "scream[s] and holler[s]" at her children.  She testified that she feels "stressed" and has been experiencing panic attacks as a result of menopause (Tr. 55).  She testified that she has good days and bad days.  On the bad days she is "crabby" and doesn't want to go anywhere or do anything and her back hurts.  On a good day she is happier, more talkative, more friendly, and more energetic (Tr. 62).  She testified that she has seen a psychiatrist in the past, but was not under the care of a psychiatrist or psychologist at the time of the hearing.  Her physician prescribes the Cymbalta.  She testified that she attempted suicide in 2001 by taking 56 ibuprofen.  She spoke to a psychiatrist at that time (Tr. 55-57).  She testified she has difficulty completing tasks (Tr. 58).

Vincent Stock, a vocational expert, testified at the hearing.  He testified that a hypothetical

claimant with the capacity to perform sedentary work, with the ability to lift, carry, push, or pull ten pounds occasionally, and less than ten pounds frequently, could sit for six hours in an eight-hour workday, and stand or walk for two hours in an eight-hour workday, could occasionally climb, balance, stoop, crouch, kneel, or crawl, and should avoid ladders, ropes, scaffolds, moving machinery, or unprotected heights, would be able to perform Claimant's past relevant work as a dispatcher and accounting clerk (Tr. 67). Upon questioning from Claimant's attorney, the vocational expert testified that if Claimant needs extra breaks and would not be able to work a full eight-hour day those restrictions would "impose significant limitations in terms of being able to work a full-time job, whether it be sedentary or otherwise" (Tr. 68).

### *The ALJ's Decision*

The ALJ rendered a decision denying benefits on May 28, 2008 (Tr. 11-21). As an initial matter, the ALJ found that Claimant met the insured status requirements of the Social Security Act through December 31, 2007 (Tr. 13). The ALJ found at step one that Claimant had not engaged in substantial gainful activity since January 1, 2004, the alleged onset date of her disability. At step two, the ALJ found that Claimant had the severe combination of impairments of bilateral cubital tunnel syndrome, diabetes mellitus, degenerative disc disease of the lumbar spine, hypertension, residual of status post right ankle open reduction and internal fixation, tachycardia, obesity, hypothyroidism, and history of diabetic neuropathy, sacroiliac strain, left tronchanteric bursitis, and status post right lateral epicondylar and bilateral carpal tunnel releases. In making these determinations, the ALJ discussed Claimant's medical history and determined that the impairments listed "cause significant limitation in the claimant's ability to perform basic work activities" (Tr. 15). The ALJ determined, however, that Claimant did not have the severe impairment of depression. The ALJ cited the regulations that a medically diagnosed impairment cannot be established without

17

medical evidence, and that an impairment is not severe if it is only a slight abnormality that cannot reasonably be expected to result in any more than a minimal limitation on a claimant's ability to work, and that an impairment must be expected to last for at least 12 months.  The ALJ found that the Claimant's mental status has never deteriorated to such a level to require psychiatric intervention or psychiatric hospitalization.  The ALJ noted that during the alleged period of disability, the Claimant did not seek any mental health treatment.  The ALJ found that Claimant did not demonstrate evidence of deterioration of personal hygiene, daily activities, interests, effective intelligence, reality contact, thought processes, memory, speech, mood, affect, attention span, insight, judgment, behavior patterns, or motor activity due to any mental disorder.  He found that the Claimant's ability to think, understand, remember, communicate, concentrate, get along with other people, and handle normal work stress did not appear to be significantly, or more than mildly, impaired.  He found that the Claimant had no or only mild restriction of activities of daily living or difficulties maintaining social functioning or concentration, persistence, or pace, and there was no evidence of any repeated episodes of decompensation of "extended duration."  He noted, "[t]here is no objective medical evidence of a medically determinable and diagnosed mental impairment imposing significant, or more than mild, mental functional limitations."  Thus, the ALJ found that claimant had not established a severe mental impairment (Tr. 16).

At step three the ALJ found that Claimant's impairments or combination of impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the listing of impairments (Tr. 16).  Based upon the evidence in the record, the ALJ found Claimant had the residual functional capacity ("RFC") to perform sedentary work "except for lifting or carrying more than ten pounds occasionally and less weight frequently; standing or walking more than two hours in an eight-hour workday; climbing ladders, ropes, or scaffolds; climbing ramps or stairs,

18

balancing, stooping, kneeling, crouching, or crawling more than occasionally; and exposure to unprotected heights or dangerous machinery" (Tr. 16).

In making this determination, the ALJ found that while the Claimant's medically determinable impairment could reasonably be expected to produce the symptoms alleged, the Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  He found, first, that her daily activities were inconsistent with her allegations of disabling symptoms in that she was able to "live and function independently," care for her minor dependent children, cook, perform light household chores, serve as a volunteer secretary of the VFW Ladies Auxiliary, plant and tend flowers, shop, and drive a car (Tr. 17-18). He found that diagnostic testing has shown "some abnormalities" but not of a "disabling frequency, severity, and duration."  In support of that conclusion, the ALJ noted that except for the 2004 surgery on her right elbow, Claimant had required only conservative treatment.  She did not seek medical treatment from Dr. Tse, her primary care physician, for almost a year.  The record shows a lack of prescribed pain medication, and no evidence that pain medication is not effective when prescribed, nor that it imposes significant side effects.  Claimant does not require orthotic or assistive devices; she can walk independently.  There is no evidence of significant joint or spine abnormality or range of motion limitation (Tr. 18).

The ALJ found that despite a mild bulging disc at L5-S1, Claimant has good lumbar spine range of motion with only mild tenderness.  There is no evidence of foraminal narrowing or stenosis. Claimant does have type 2 diabetes, but there is no evidence of "significant end organ dysfunction, non-healing wounds, retinopathy, or nephropathy."  Claimant has not fully complied with medication and diet to control her diabetes, and the "severity of claimant's symptoms do not appear sufficient to motivate" compliance.  He found that her obesity imposes some functional limitations,

but there is no evidence of severe chronic pain or significant range-of-motion limitation of a weight-bearing joint.  Her hypertension is medically controlled, as is her hypothyroidism.  Finally, the ALJ noted that despite her elbow and arm problems, she still maintains upper extremity strength with only minor manipulative limitations (Tr. 18-19).

The ALJ also found that Claimant's work after the alleged onset of disability diminishes her credibility.  She received unemployment in 2006, which requires an indication that she is ready, willing, and able to work.  The ALJ found her to be in no obvious distress during the hearing (Tr. 19).

The ALJ granted little weight to the medical statement from Dr. LeBeau regarding her physical limitations because it did "not articulate an objective medical basis for the extreme limitations;" it is inconsistent with other evidence in the record, including other medical evidence and Claimant's own reports of her daily activities; and it is largely based upon the Claimant's subjective complaints.  The ALJ also granted no weight to the recommendation of Ms. Ross that claimant was disabled.  Instead, the ALJ relied on Ms. Ross's FCE, which found that Claimant could perform sedentary work (frequent sitting and occasional standing and walking) (Tr. 20).

The ALJ granted significant weight to the opinions of Claimant's treating orthopedic surgeon, Dr. Grebing, because they were supported by clinical signs, symptoms, and findings in the record and were "generally corroborated" by the finding of other medical sources.  The ALJ considered but rejected the opinion of non-examining physician Dr. Bernet who found that Claimant could perform light work.  The ALJ found instead that "claimant's symptoms and limitations are more limiting than was concluded" by the non-examining sources (Tr. 20).  Ultimately, the ALJ found claimant's allegations that she is incapable of all substantial gainful work not credible due to the "significant inconsistencies" in the record (Tr. 20).

At step four, the ALJ found, based upon the testimony of the vocational expert, that Claimant could perform her past work as a dispatcher or accounting clerk. Thus, he found Claimant not disabled from January 1, 2004, through May 28, 2008, the date of the decision (Tr. 20-21).

## CONCLUSIONS OF LAW

### *Standard of Review*

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The Claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability. 20 C.F.R. § 416.920. The ALJ first considers whether the claimant is presently employed or engaged in "substantial gainful activity." 20 C.F.R. § 416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 416.920(d). If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *Id*. If, however, the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of her past work. 20 C.F.R. § 416.920(e). If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. § 416.920(f). However, if the claimant shows that

her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g).

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *See also White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) ("the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" (citation and quotation marks omitted)).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972) (quoting *Consolidated Edison Co. V. NLRB*, 305 U.S. 197, 229 (1938)).  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Golembiewski*, 322 F.3d at 915; *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  The "substantial evidence" standard requires an ALJ to at least "minimally articulate" his reasoning. *Zblewski v. Astrue*, 302 Fed. Appx. 488, 493 (7th Cir. 2008) (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).

This deferential standard applies, *inter alia*, to findings of the claimant's credibility. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations

22

generally will not be overturned unless they were patently wrong.").  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws") .

An ALJ need not address every objective finding in the record, however, for his judgment to be supported by substantial evidence.  The ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). The Seventh Circuit does not require an ALJ "to address every piece of evidence or testimony in the record." *Zurawski*, 245 F.3d at 889.  Rather, the Seventh Circuit allows "a commonsensical reading" of a claimant's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

### *ALJ's RFC Determination*

The Claimant argues that the ALJ's RFC determination was not supported by medical evidence in the record and that the ALJ improperly discounted Dr. LeBeau's opinion regarding claimants functional limitations.

In determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including the claimant's own descriptions and observations of his limitations.  20 C.F.R. § 404.1545(a)(3).  The ALJ, not a medical source, has the ultimate responsibility for determining a claimant's RFC. 20 C.F.R. § 404.1546(c).

The ALJ's RFC determination was based upon substantial evidence in the record.  The ALJ gave greater weight to the opinion Dr. Grebing, a treating specialist, that Claimant could lift, push, or pull a maximum of 15 pounds.  He credited Dr. Grebing's opinion because it was based on

23

numerous clinical findings and was corroborated by the other physicians Claimant saw for her elbow.  The ALJ is entitled to give more weight to the opinion of a specialist on an issue related to that physician's area of specialization than to the opinion of a non-specialist medical source. 20 C.F.R. § 404.1527(d)(5).  The ALJ stated that he gave consideration to the opinion of the state agency physician Dr. Henry Bernet.  Claimant argues that because the ALJ found that Claimant was limited to sedentary work and Dr. Bernet found that Claimant could perform light work, then the ALJ's statement that he relied on the opinion of Dr. Bernet was incorrect.   This argument puts form over substance considering that the ALJ found the Claimant *more* limited than did Dr. Bernet.  Moreover, it is reasonable for the ALJ to consider the opinion of Dr. Bernet, but find that other evidence in the record indicates more restriction in her RFC than determined by Dr. Bernet.  Furthermore, the ALJ did grant weight to Ms. Ross's opinion that the Claimant could stand and walk occasionally and sit frequently in finding that she could perform sedentary work.

Based upon the ALJ's discussion of the opinion evidence in the record and his finding that the Claimant's subjective complaints were not credible, the ALJ did more than "minimally articulate" the findings upon which his RFC determination was made.  Thus, the undersigned recommends that the ALJ's RFC determination was based upon substantial evidence on the record as a whole.

### Dr. LeBeau's Opinion

The Claimant contends that the ALJ erred in failing to give proper weight to the opinion of Dr. LeBeau, Claimant's treating physician.  A treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  *See also Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).  An ALJ may discount the opinion of

24

a treating physician if it is inconsistent with other evidence in the record. *Skarbek v. Barnhart*, 390 F.3d 500 503-04 (7th Cir. 2004).  If an ALJ rejects a treating physician's opinion, the ALJ must articulate the reasons for discounting that opinion. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

The ALJ rejected Dr. LeBeau's statement regarding Claimant's disability because it did not "articulate an objective medical basis for the extreme limitations."  The ALJ further found that Dr. LeBeau's statement was based on the Claimant's subjective complaints rather than objective medical findings, and it was inconsistent with other objective evidence in the record including Claimant's self-reports of her daily activities.  Dr. LeBeau's statement of Claimant's functional limitations widely diverged from the other evidence in the record.  He opined that Claimant could stand and walk only five minutes in an eight-hour workday, sit for only twenty minutes before having to move, and could not work an entire day without lying down.  He did not indicate upon what evidence these opinions were based, and the medical records submitted by Dr. LeBeau do not show that he performed any type of objective tests regarding Claimant's limitations or even made observational findings of her abilities.  He saw her for a vaginal infection, a spider bite, diabetes, sleep apnea, and restless leg syndrome.  She did not complain of back and arm pain until January 30, 2008.  The record indicates that Dr. LeBeau did not make any objective findings at that time, but noted in the chart that Claimant had undergone an MRI, nerve conduction studies, and a functional capacity evaluation in the last two years.  Based on these inconsistencies with the record as a whole and the ALJ's sufficient articulation of the reasons he discounted Dr. LeBeau's opinion, the undersigned recommends that the ALJ did not err in discounting Dr. LeBeau's opinion.

***Claimant's Mental Impairments***

Claimant argues that the ALJ erred in not ordering a consultative examination to evaluate

25

Claimant's mental impairments. Claimant argues that she testified regarding her mental impairments at the hearing and contends she was being treated for depression by primary care physicians who had prescribed antidepressants.

Under the regulations, a claimant has the responsibility of proving that he or she is disabled by furnishing medical records and other evidence. 20 C.F.R. § 404.1512(a). It is the Claimant's responsibility to provide evidence showing an impairment, its severity, and how the impairment affected the Claimant's functioning during the alleged period of disability. 20 C.F.R. §404.1512(c). An ALJ is entitled to assume that a claimant represented by counsel has "made his best case" before the ALJ. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). An ALJ should obtain consultative examinations at the Commissioner's expense where relevant information is "not readily available from the records of [a] medical treatment source." 20 C.F.R. § 404.1512(f). Whether to order a consultative examination is within the discretion of the ALJ. *See Skinner*, 478 F.3d at 844 ("The ALJ is not *required* to order such examinations but may do so if an applicant's medical evidence about a claimed impairment is insufficient."). In *Skinner*, the Seventh Circuit found that an ALJ's statement that the record contained "very limited objective medical evidence" of disability was not an indication that there was a gap in the record that a consultative examination could fill, but that the ALJ was highlighting the lack of objective evidence submitted to support a claim of disability. *Id.* at 844.

Except for the prescriptions for antidepressants, the record contains no evidence that Claimant complained of depression to any treating physician. Dr. LeBeau noted "depression" in her chart and prescribed Cymbalta. The record does not contain any treatment notes or evaluations by a mental health professional, nor does it contain any indication from a treating physician of a need for such evaluations. Even though an ALJ is directed to order a consultative examination where

relevant information is not available, the burden remains on the Claimant to provide evidence of an impairment.  Thus, as in *Skinner*, the lack of evidence here did not reveal a gap in the record, but demonstrates a lack of support for a finding of disability based on depression.  As such, the undersigned recommends the ALJ did not err in failing to order a consultative examination of Claimant's mental impairments.

### CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that Claimant has failed to demonstrate that the ALJ's decision was not supported by substantial evidence or that she committed an error of law. It is therefore **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be entered in favor of the Commissioner, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have fourteen (14) days after service of this Recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals.  *Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir.2004); *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: February 22, 2010**


                                    s/ *Donald G. Wilkerson*
                                    **DONALD G. WILKERSON**
                                    **United States Magistrate Judge**

27